**Affirmed and Memorandum Opinion filed August 30, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00292-CV

## IN THE INTEREST OF X.G. AND V.G., CHILDREN

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-01249J**

## M E M O R A N D U M   O P I N I O N

K.D.S. (Mother) and K.G. (Father) each appeal from a final judgment terminating their parental rights to X.G. (Xan) and V.G. (Virginia), their minor children.[1] Mother and Father raise the same challenges to the trial court's judgment on appeal. Both contend the evidence is legally and factually insufficient to support (1) the trial court's finding on endangerment and (2) the trial court's finding that termination of their parental rights is in the best interest of the children. We affirm.

---

[1] We use pseudonyms to refer to appellants, their minor children, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8.

# I. FACTUAL AND PROCEDURAL BACKGROUND

*The Texas Department of Family and Protective Services's Investigation*

The Texas Department of Family and Protective Services received a referral alleging neglectful supervision of Virginia by Mother. Mother tested positive for marijuana on August 28, 2016, while pregnant with Virginia. Three months later, Mother tested negative for drugs during delivery. Virginia was not tested for drugs at that time.

Within days of Virginia's birth the Department assigned an investigator to the case. The investigator was able to contact the family after several attempts. During the investigation, Mother stated she was unemployed. Mother had given birth to six children, and four had been placed elsewhere. Mother admitted that she had a history with the Department, and that her children had been removed due to her drug use. Mother indicated that as a child she had been diagnosed with bipolar disorder.

During the Department's investigation, Mother reported a history of domestic violence with Father with whom she was no longer in a relationship. Mother also admitted to using drugs during the first trimester of her pregnancy with Virginia. She attributed that drug use to stress-related to arguments with Father. Mother stated she did not use drugs during the remainder of her pregnancy.

The investigator also spoke with Father's mother (Grandmother). Grandmother stated Father and Mother had been in a relationship, off and on, for over three years. According to Grandmother, Father and Mother argued over money, which was one of the main reasons Father moved back in with Grandmother.

After the initial contact, the investigator was unable to make contact with the family between November 2016 and February 2017. In February 2017, the investigator contacted Father's sister (Aunt), who informed the investigator that she

lived with Grandmother, Father, Mother, Xan, Virginia, and the Aunt's step-father. Aunt indicated Mother has been living with them since September 2016 and Father had never moved out.

The investigator then attempted another welfare check at the home indicated by Aunt. Mother communicated with the investigator through the telephone, but would not open the door. Mother indicated she had been using marijuana and could not pass a drug test. Mother stated she needed to get her system clean before taking a drug test because "she is not going to let [the Department] take any more of her children."

Later that afternoon, the investigator returned to the home. Mother opened the door and the investigator observed Xan walking around playing with toys and Virginia asleep on the couch. The investigator reported during the course of one conversation Mother quickly became irrational, and had drastic mood swings.

*Mother's History with the Department*

Mother is 24 years old and has four other children in addition to Xan and Virginia. Mother had several prior cases involving the Department, starting in 2011. In October 2011, the Department received a referral of neglectful supervision of A.R. (Ana). Mother tested positive for marijuana when Ana was born. Mother was reported to have bipolar disorder and had been arrested for assault of Mother's father. Mother and Ana were released from the hospital before the Department could make contact.

In January 2012, the Department received a referral alleging neglectful supervision and physical abuse of G.J. (Grace) and Ana by Mother and her boyfriend J.R. (Jerry), the father of many of the children. It was reported that Mother and Jerry were using and selling marijuana and methamphetamine, and also giving those drugs

to the children. Grace tested positive for marijuana and Ana tested positive for marijuana and methamphetamine. Mother had "bragged" about giving the children marijuana and alcohol to go to sleep. The caseworker testified the Department believed that Mother made the drugs available to the children, but the Department ruled out the allegations.

In April 2014, the Department received a report of neglectful supervision of Grace, Ana, and E.R. (Earl) by Mother and Jerry. According to the report, Jerry had been diagnosed with a psychotic disorder and had auditory hallucinations resulting in him taking the children to the airport because of voices telling him there was money and a prize waiting for him there. Jerry had a history of marijuana use and was hospitalized to be evaluated. Mother had bipolar disorder and a history of not taking her medication. Mother reportedly smoked marijuana daily. Jerry was given new medication and the children were to be returned to him upon his release from the hospital. The case was closed because the Department could not locate the family to investigate the allegations.

In December 2014, the Department received a referral alleging neglectful supervision of K.R. (Karen), Ana, and Earl by Mother and physical neglect of Ana by Jerry. According to the report, there was no running water in Jerry's home. The children had lived with Jerry for approximately two months as of November 2014. The home did not have insulation and was cold. There was a portable heater in the room where the three children slept with Jerry. Jerry reportedly did not work. Mother had a history of domestic violence with Jerry.

In relation to that case, the court-appointed Child Advocate testified that Mother gave the three children to Jerry the day he was released from jail. According to the Child Advocate, Mother was aware Jerry had mental health issues, used drugs, and did not have a job or safe home. Mother testified that when Jerry got out of jail,

he called her to tell her he fixed the house and put water in the house. Mother left the children at the end of the street where Jerry lived because Jerry would not allow Mother to enter his property. Mother testified that Jerry "wanted to raise them and he wanted to be with them and I said that was fine." Mother agreed if she would have known about the condition of Jerry's home she would have "taken steps." Additionally, Mother testified that child-support proceedings were ongoing between Jerry and Mother, and she was taking responsibility for her children. Jerry received services, working with the Department. Karen, Ana, and Earl were returned to Jerry's care.

In April 2015, the Department received a report of sexual abuse of four-year-old Grace by a maternal uncle. The Child Advocate testified that Mother had abandoned Grace. According to the Child Advocate, Mother called a non-family member and asked the person to pick up Grace. Mother also asked if that person would take another child, Karen, who was four months old at the time. The non-family member only agreed to take one child, picked up Grace, and took her to Fort Worth, Texas. Once in Fort Worth, the non-family member contacted the Department's office in Tarrant County. The Department's records reflect that Grace was severely malnourished and bloated and had welts on her back. Additionally, Grace's behavior suggested she had been sexually abused.

Mother testified the non-family member was her stepmother whom she had known for "twenty-something years." Mother asked her to keep Grace, who was born in 2010, while Mother "got on her feet." Mother's parental rights were terminated as to Grace in October 2016, based on the predicate ground of constructive abandonment under section 161.001(b)(1)(N) of the Texas Family Code. Grace was later adopted.

5

*The Department's Suit to Terminate Mother's and Father's Parental Rights to Xan and Virginia*

The Department originally tried to utilize Family Based Safety Services (FBSS) in this case, but Mother was uncooperative. Throughout the investigation, Mother violated safety measures the Department had put in place and Mother evaded contact for a period of four months. Mother refused attempts to secure safety measures for the children or engage in services to address her mental health and substance-abuse issues. Accordingly, the Department filed an original petition for conservatorship and termination and sought to be appointed temporary managing conservator of Xan and Virginia.

*Evidence about Mother*

Mother testified she first smoked marijuana when she was 16 years old. Mother did not know how many times she had smoked marijuana since the birth of her oldest child, Grace, in December 2010. Mother met Father in 2014 and they had smoked marijuana together. The Department introduced evidence related to Mother's drug tests. Mother tested positive for marijuana on January 14, 2015, August 28, 2016, October 2016, February 28, 2017, March 14, 2017, April 25, 2017, and May 12, 2017. At the time of Mother's August 28, 2017 positive drug test she was pregnant with Virginia. Mother's last positive drug test was in May 2017. However, on November 28, 2017, Mother walked out of an alcohol screen without providing a sample and could not complete a drug screen due to not having enough finger or toe nail to sample. Mother stated she was not around her children while using marijuana.

Bruce Jefferies, with the National Screening Center, testified that Mother's February 28, 2017 positive drug test for marijuana revealed a high level of marijuana, "getting to the chronic stage." Jefferies testified the result revealed

everyday smoking. Additionally, Jefferies testified that Mother's April 25, 2017 drug-test results revealed a high reading related to marijuana suggesting "chronic use." With respect to Mother's test results on January 14, 2015 and March 14, 2017, Jefferies testified the level of marijuana was not high.

When questioned about Mother's admission that she smoked marijuana while pregnant, Jeffries stated that smoking marijuana while pregnant affects the unborn child and is dangerous. During trial, Mother denied smoking marijuana when she was pregnant. She stated she tested positive because she was around people who were smoking marijuana and inhaled it.

Jefferies acknowledged that Mother had not tested positive for marijuana in approximately 11 months. He indicated Mother appeared to be in recovery from her addiction. However, he testified that 11 months was a short term and additional testing was needed. According to Jefferies, smoking marijuana during pregnancy has been known to cause blindness and deafness in children. Jefferies testified that most strains of marijuana being sold are more potent than marijuana sold in the past.

The Department's caseworker acknowledged that Mother had testified she did not believe marijuana was a drug and instead an organic plant. Mother later completed a drug-treatment program. Mother testified that she now thinks marijuana is a drug, and that she has not smoked marijuana since her last positive drug test. Mother testified that she had never been told that two of her children had tested positive for marijuana.

According to the caseworker, Mother had been diagnosed with bipolar disorder. When asked what "bipolar" means, Mother said she gets mood swings and gets angry easily. Mother took medication to address the mood swings and anger. The caseworker testified the Department had concerns with Mother's mental health, and her not taking her medications. Mother testified that she is now on medication

and has been on her current medication for about a month.

The trial court admitted into evidence a report from Kinghaven Counseling Group. The report detailed Mother's psychological treatment while the case was pending. A psychological evaluation conducted on March 3, 2017, listed a diagnosis of "bipolar depression." Mother reported experiencing domestic violence in intimate relationships as an adult. During follow-up visits through January 2018, Mother reported a dysfunctional relationship with Father and discussed encounters that were "mean spirited and wounding to her." Mother reported being abused as a child. Mother reportedly was experiencing stress related to the children's removal and marital distress. Mother was reported to have anger issues. Before the August 2017 session, Mother had not attended counseling for two months. During her session in August 2017, Mother reported she was having a nervous breakdown. During most visits, Mother reported being compliant with her medication. However, in October and November 2017, Mother was noted to be non-compliant with her medication. Counseling and psychiatric treatment was recommended for symptom management.

The Child Advocate testified that Mother and Father were not married. She reported that verbal domestic abuse was taking place in the home between Mother and Father.

Mother testified it was not the right time to get married to Father. Mother testified she dropped out of high school in tenth grade because she no longer felt that she needed school. However, she stated she is focused on getting her high school equivalency certification.

Mother was given a family service plan and she performed the requested services. Mother did not have stable employment, but collected Social Security Disability for mental disability, bipolar disorder. She stated she occasionally worked, but did not want to run the risk of losing her disability payments, which she

8

used to pay most of her rent. Mother depended on Father's income to pay the rest of the rent. The Child Advocate testified that Mother's Social Security Disability income could not cover child care if needed. Mother did not have reliable transportation.

The Child Advocate testified that she believed Mother has good intentions and has "tried", but the Child Advocate voiced concerns that if things got difficult Mother would give up her children as she did with Grace, Ana, Karen, and Earl. Mother testified that she had changed and asked to be given another chance.

*Evidence about Father*

Evidence admitted at trial showed Father tested positive for marijuana on March 3, 2017 and March 14, 2017. Jefferies testified that Father's March 2017 drug test results indicated Father was smoking marijuana daily. Father tested positive for benzoylecgonine, cocaine, cocaethylene, marijuana, and marijuana metabolites on April 25, 2017. According to Jefferies, the result related to cocaine was low, showing a use of more than one time. The result related to cocaethylene, which is cocaine and alcohol ingested at the same time, was low. Jefferies testified that Father's marijuana metabolite result depicted chronic use. On August 15, 2017, Father tested positive for alcohol. Jefferies testified the test result for alcohol was high.

After his positive drug test in April 2017, Father completed substance-abuse treatment and was discharged successfully. No further treatment was recommended for Father related to substance abuse, but the agency treating Father indicated a concern that he was not sober during the treatment sessions. Despite the agency's concerns, Father did not test positive on drug tests during that time. Father failed to complete a drug screen on November 28, 2017, due to not having enough finger or toe nail to sample.

9

Jefferies acknowledged that Father had not tested positive for marijuana in approximately 11 months. He indicated Father was in recovery from addiction. However, as with Mother, Jefferies testified that 11 months was a short term and additional testing was needed.

Father's criminal history included a conviction for theft in 2013, a conviction for driving while intoxicated in 2016, and a charge of possession of cocaine in August 2016, which was dismissed. The caseworker testified she heard Father admit that he possessed cocaine in August 2016. The Child Advocate report, admitted into evidence, indicated that Father had been incarcerated from November 2016 to January 2017.

Father had another child who, at the time of trial, was living with the child's mother outside of Texas. Father told the Child Advocate that he did not pay child support related to that child. He also told the Child Advocate that he had no contact with that child, although he represented to others that he was in communication with the child.

Father was given a family service plan and he performed the requested services. Although Father missed some visits with the children, he visited the children during the case. His visits with the children were appropriate. Father has stable housing. The Child Advocate testified she did not believe Father had reliable transportation.

*Evidence about the Children*

At the time of trial Xan was two years old and Virginia was one year old. The children were placed in an adoptive foster home when they were 15 months old and four months old respectively. The foster father is employed and the foster mother does not work outside the home.

The foster family was meeting the children's physical and emotional needs. Neither child was noted to have special needs. The Child Advocate testified that the children are bonded with the foster parents and they are thriving in the foster home. The Child Advocate's report indicated that neither child exhibited a strong bond with Mother or Father during visitation. Further, the Child Advocate observed that the children were upset and anxious when visiting Mother and Father.

The Department's stated goal for the children is adoption by individuals unrelated to the children. The caseworker stated the reason for this goal is the parents' substance abuse, Mother's lack of stable employment, and the parents' history with their other children. Between the two of them, the parents had seven children whom they had relinquished to adoption, given to other adults, or were in the Department's custody. The Child Advocate also noted concerns related to Mother's mental health and Mother's failure to comply with medication, both parents' drug-abuse history, and the family pattern with other children.

When the Department originally removed Xan and Virginia from the parents, Xan was a year behind on standard immunizations and Virginia had not had any immunizations. At the time of trial, both children were currently up to date on immunizations and medical and dental care.

At the conclusion of trial, the trial court found by clear and convincing evidence that both parents had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. The trial court further found that termination of both parents' rights was in the best interest of Xan and Virginia.

## II. ISSUES AND ANALYSIS

Parental rights can be terminated upon proof by clear and convincing evidence

11

that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2) (West Supp. 2017); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother and Father each raise two issues on appeal. In the first issue, Mother and Father challenge the trial court's endangerment finding under Family Code section 161.001(b)(1)(E). In the second issue, Mother and Father challenge the trial court's finding that termination of their parental rights is in the children's best interest.

## A.     Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.–Houston [14th Dist.] 2012, no pet.). Despite the constitutional magnitude of parental rights, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.–Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a termination case, we consider all the evidence in the light most favorable to the finding to determine

whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## B.    Predicate Termination Ground

The trial court found that Mother and Father "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Under subsection E, the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th

Dist.] 2005, no pet.). A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but disregards it. *In re S.M.L.*, 171 S.W.3d at 477.

Termination under subsection 161.001(b)(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *In re C.J.S.*, 383 S.W.3d 682, 688 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also In re J.O.A.*, 283 S.W.3d at 336 (holding that endangering conduct is not limited to actions directed toward the child). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *In re J.O.A.*, 283 S.W.3d at 336. ("[T]he endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage."). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

### 1. Mother

Mother contends the Department failed to produce clear and convincing evidence that she engaged in a voluntary, deliberate, and conscious course of conduct that endangered the physical and emotional well-being of the children. The Department points to evidence of Mother's drug abuse and mental illness, including her failure to take her medication during the case, as evidence of endangerment.

14

Mother contends her positive drug test for marijuana while she was pregnant with Virginia was due to her exposure to marijuana at a party. Mother contends she did not use marijuana while pregnant. Mother also contends her testimony that there was no domestic violence was uncontroverted. Finally, Mother contends there was no evidence of endangerment resulting from her mental health.

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345. Although mental illness alone is not grounds for termination, untreated mental illness can expose a child to endangerment and is a factor a court may consider. *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Likewise, illegal drug use may support termination under subsection 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. This court also has held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

The record reflects Mother used marijuana to the degree that she was "getting to the chronic stage," including while pregnant with Virginia. The Department received a referral concerning this drug use when Virginia was born, but Mother evaded the Department for four months before she took another drug test, at which time she tested positive. Mother represented to the Child Advocate and the caseworker that she was employed when she was not. Mother reported to the drug-testing facility on at least two occasions with "baby oil saturating [her] hair, preventing a reliable test from occurring." At least once Mother cut her fingernails

15

so short that they could not be tested. Mother contends the allegations of prior endangerment related to her other children were based on hearsay testimony.[2] Mother challenges as incompetent other evidence including evidence that two of her young children tested positive for illegal drugs.

Evidence of a parent's treatment of another child is relevant to showing a course of conduct under subsection E. *In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The evidence indicated that Mother abandoned her oldest child (Grace) while "getting her life together." Mother dropped Ana, Karen, and Earl, all young children, off at the end of Jerry's street without examining the condition of the home because she "was fine" with his request "to raise them." There was no evidence that Mother followed up regarding the children's well-being once they were in Jerry's care. If a parent endangers the well-being of other children, that conduct can support a finding of endangerment even against a child who was not yet born at the time of the endangering conduct. *In re C.A.B.*, 289 S.W.3d at 886.

Mother contends she has completed addiction treatment and parenting classes, and has "changed her life." Although a parent's recent turnaround and compliance with a service plan are factors to be considered, they are not determinative. *See M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d at 108. Based on the record evidence, the trial court could have held a firm conviction that, despite Mother's recent treatment and compliance with certain aspects of the family service plan, her endangering conduct was likely to continue. Given Mother's long history

---

[2] Mother contends much of the evidence offered by the Department was based on hearsay or was incompetent. However, Mother has not challenged the admission of this evidence on appeal.

of illegal drug use and her history of neglecting her other children, the fact finder was justified in considering the risk of relapse to be unacceptably high when weighed against Mother's recent completion of addiction treatment and parenting courses. *See In re A.F.*, No. 14-17-00394-CV, 2017 WL 4697836, at *10 (Tex. App.—Houston [14th Dist.] Oct. 19, 2017, no pet.) (mem. op.). As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of Mother's self-serving testimony. *See In re S.A.H.*, 420 S.W.3d 911, 927 (Tex. App.–Houston [14th Dist.] 2014, no pet.).

Reviewing all the evidence in the light most favorable to the termination finding under subsection E, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the finding that Mother endangered both children through her own conduct and by placing them in an endangering environment. *See In re J.O.A.*, 283 S.W.3d at 344. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the endangerment finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of the endangerment finding. *See In re H.R.M.*, 209 S.W.3d at 108. We hold the evidence is legally and factually sufficient to support the predicate termination finding under subsection E as to Mother, and we overrule Mother's first issue.

### 2. Father

Father contends the trial court's finding of endangerment was not supported by clear and convincing evidence. Father contends the evidence shows he completed his family service plan and remained sober for 11 months. Father also contends his behavior does not suggest a pattern or conscious course of endangering conduct. The Department contends the trial court's finding is supported by evidence of Father's drug abuse.

Shortly after the Department launched its investigation in November 2016, Father was convicted of driving while intoxicated. While the termination case was pending, Father tested positive for drugs twice and for alcohol once.

Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Mere imprisonment, standing alone, does not constitute engaging in conduct that endangers the physical or emotional well-being of the child. *Texas Dept. of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers the children's physical and emotional well-being. *See In re E.R.W.*, 528 S.W.3d at 265.

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering a child's well-being. *See In re J.O.A.*, 283 S.W.3d at 345; *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re S.R.*, 452 S.W.3d at 361–62. By using illegal drugs, the parent exposes the child to the possibility that the parent may be impaired or imprisoned and, therefore, unable to take care of the child. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Though Father acknowledges his history with alcohol and drug abuse, he argues that this history "is far less significant." Father argues that the trial court should have placed a greater weight on Father's completion of his family service plan. Although Father contends he completed the service plan, the record also reflects that Father thwarted drug testing by saturating his hair with baby oil and cutting his nails too short for testing. Even if Father had completely complied with

the service plan, compliance with a family service plan does not render termination impossible or trump all other termination factors. *See In re M.G.D.*, 108 S.W.3d at 514. "The elements of a safe, stable, and happy childhood cannot all be reduced to a checklist in a service plan." *Id*. Based on the record evidence, the trial court could have formed a firm conviction that despite Father's reported compliance with the family service plan, his endangering conduct was likely to continue. As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of Father's self-serving evidence. *See In re S.A.H.*, 420 S.W.3d at 927.

Reviewing all the evidence in the light most favorable to the termination finding under subsection E, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the finding that Father endangered both children through his own conduct. *See In re J.O.A.*, 283 S.W.3d at 344. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the endangerment finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of the endangerment finding. *See In re H.R.M.*, 209 S.W.3d at 108. We hold the evidence is legally and factually sufficient to support the predicate termination finding under subsection E as to Father, and we overrule Father's first issue.

## B.    Best Interest of the Children

Texas courts presume that keeping children with their natural parent serves the children's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See In re S.R.*, 452 S.W.3d at 366. The considerations the trier of fact may use to determine the best interest of the children,

known as the *Holley* factors, include:

(1) the desires of the children;

(2) the present and future physical and emotional needs of the children;

(3) the present and future emotional and physical danger to the children;

(4) the parental abilities of the persons seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the children;

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parents' acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In addressing the predicate grounds, we analyzed each parent's acts and omissions. In reviewing the sufficiency of the evidence to support the trial court's finding on best interest we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship the children have with the parent. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). Therefore, in analyzing whether termination of each parent's rights is in each child's best interest, we focus on the evidence regarding the nature of the relationship between the parents and their children.

*Children's Desires and Stability of the Home or Proposed Placement*

Mother contends this factor is neutral as there is no evidence about the desires of the children outside of the statement that they are bonded with the foster parents. Additionally, Mother contends Father's visits with the children have been appropriate. Father contends while the children are too young to express their desires and arguably are bonded to the foster parents, they also arguably share bonds with Father through a natural, familial connection and consistent visitation. The Department contends this factor weighs in favor of the trial court's findings because of the evidence that the children are thriving with the foster parents, are bonded to them, and grow anxious during visits with Mother and Father. Additionally, the Department argues that the parents' decision not to marry weighs in favor of the best-interest finding because the parents could separate at any time, creating instability for the children and the family home.

When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are receiving good care in the current placement, and have spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the children's best interest. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.). Texas courts recognize as a paramount consideration in the best-interest determination the children's need for permanence through the establishment of a "stable, permanent home." *See K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the children is relevant to the best-interest determination. *See C.H.*, 89 S.W.3d at 28.

At the time of trial, Xan was two years old and Virginia was one year old. At the time of removal, Xan was one year old and Virginia was four months old. Mother

21

was unemployed and her income consisted of disability payments. The evidence showed that while the parents were living in an apartment, Mother's income alone would not pay the rent. The Department noted concerns that the parents could separate at any time, including evidence that Mother and Father's relationship had been "on and off."

The record reflects that the children are doing well in the foster placement and the foster parents want to adopt them. The children are now up to date on their immunizations and medical and dental care. Contrary to Father's contention, the record reflects the children have bonded with the foster parents, but appear anxious during their visits with Mother and Father. This factor weighs in favor of the trial court's finding.

*Emotional and Physical Needs of the Children Now and in the Future and Emotional and Physical Danger to the Children Now and in the Future*

Mother contends the evidence presented at trial establishes that the parents could meet the children's needs, notwithstanding the evidence that the children's needs are being met in their current placement. Mother argues that the Department has shown she does not pose a danger to the children because it has failed to restrict her access to the children. Mother contends the evidence in relation to these factors weighs against the trial court's finding. Father contends that he has completed his family service plan and demonstrated that he can provide for his children's present and future needs.

The record contains evidence related to Mother's mental health, Father's criminal history, and both parents' substance-abuse history. This evidence weighs in favor of the trial court's finding.

A parent's drug use supports a finding that termination is in the best interest of the children. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007,

22

no pet.). The fact finder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d at 927; *see also In re B.G.*, No. 14-14-00729-CV, 2015 WL 393044, at *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2015, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming the decision that termination was in the best interest of a child).

Although a reasonable fact finder could credit both parents' progress and decide it justified the risk of preserving the parent-child relationship, we cannot say the trial court acted unreasonably in finding the children's best interest lay elsewhere. *See In re M.G.D.*, 108 S.W.3d at 514. It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the children's best interest for the considered judgment of the fact finder. This factor weighs in favor of the trial court's finding.

> *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the children by the individuals or agency seeking custody*

These factors compare the Department's plans and proposed placement of the children with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother contends she demonstrated she is capable of parenting the children, and that Father has stable housing. Father notes that the foster parents "reportedly are appropriate and nurturing," but "[t]he parents are ready for their children to be returned to their custody and care." The Department contends that Mother's prior history with the Department, drug abuse while caring for Xan and Virginia, and the children's medical history supports the trial court's determination.

The fact finder may consider a parent's parenting skills in a best-interest analysis. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no

pet.). The evidence shows that both parents completed their services, although there is some question whether Father maintained his sobriety. The record reflects that Mother and Father visited with the children during the case. The Child Advocate, however, indicated the children grew anxious during visits with both parents.

Mother and Father have an unstable relationship. Father has another child from another relationship whom he does not support. Mother abandoned other children.

In contrast, the foster parents have bonded with Xan and Virginia. According to the Child Advocate's report, within five days of being assigned to their foster home, Xan and Virginia had seen a pediatrician and had begun receiving immunizations. Both children are developmentally on target, refer to their foster parents as "mama" and "papa" or "poppy." The foster father, an air conditioning and heating technician, has had steady employment since 2014. The foster mother "stays home with the children and is devoted to providing them a loving and nurturing home." This evidence of a safe and stable home weighs in favor of the trial court's finding.

*Availability of Programs to Assist Those Seeking Custody in Promoting the Children's Best Interest*

The record reflects that, to their credit, both parents took advantage of programs to assist them in obtaining the return of their children. They completed most of the tasks on the service plan and completed parenting classes. Yet, the fact finder was free to weigh evidence favorable to this factor against evidence of the other factors in making the best-interest determination.

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of both parents' rights is in the children's best interest. Based on the

24

evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating the parents' rights was in the children's best interest so that they could promptly achieve permanency through adoption. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *In re M.G.D.*, 108 S.W.3d at 513–14. Accordingly, we overrule Mother's and Father's challenges to the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding.

## III. CONCLUSION

Having concluded that the evidence is legally and factually sufficient to support the predicate termination finding under subsection E as to both Mother and Father and that termination of both Mother's and Father's parental rights is in the best interest of Xan and Virginia, we affirm the judgment terminating both parents' parental rights and naming the Department managing conservator.

/s/     Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Boyce and Busby.

25